UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NATURE'S PLUS NORDIC A/S and
DERMAGRUPPEN A/S,

                              Plaintiffs,

                    -against-

NATURAL ORGANICS, INC., HOUSE OF
NATURE A/S, HANS KARE LUNDESTAD,
and ORGANIC HOUSE A/S,

                              Defendants.
-------------------------------------------------------X

FILED
CLERK

11/6/2013 4:16 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM AND
ORDER**
09-CV-04256 (ADS)(AKT)

**APPEARANCES:**

**Fox Rothschild LLP**
*Attorneys for the Plaintiffs*
997 Lenox Drive Bldg. 3
Lawrenceville, NJ 08648
   By:  Christopher Robert Kinkade, Esq.
          Ernest Edward Badway, Esq., Of Counsel

**Meyer, Suozzi, English & Klein, P.C.**
*Attorneys for the Defendant Natural Organics, Inc.*
990 Stewart Avenue, Suite 300
Garden City, NY 11530
   By:  Kevin Schlosser, Esq.
          Michael J. Antongiovanni, Esq., Of Counsel

**SPATT, District Judge**.

On October 2, 2009, Nature's Plus Nordic A/S ("NPN") and, its parent company, the

Plaintiff Dermagruppen A/S ("Dermagruppen") (collectively the "Plaintiffs") filed this action

alleging (1) breach of contract; (2) violation of the Lanham Act, 15 U.S.C. § 1125(a) based on

unfair competition; (3) violation of the New York Franchise Sales Act ("NYFSA"), General

Business Law §§ 681 et seq. ; and other related claims arising out of an agreement between

NPN, previously known as Benevo A/S ("Benevo"), and the Defendant Natural Organics, Inc.

1

("NOI") to distribute health supplements manufactured by NOI to retail stores in Norway, Sweden, Denmark, and Finland.

On October 28, 2009, NOI answered the complaint, and asserted counterclaims against the Plaintiffs for breach of the distribution contract and violation of the duty of good faith and fair dealing.

Default judgments have been entered against the Defendants House of Nature A/S ("HON"), Hans Kare Lundestad ("Lundestad"), and Organic House A/S ("Organic"). Thus, claims remain pending only against NOI.

On June 25, 2013, the Plaintiffs moved for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 on their breach of contract claim on the amended complaint. NOI opposed the motion, and, on August 7, 2013, cross-moved for partial summary judgment pursuant to Fed. R. Civ. P. 56 dismissing the Plaintiffs' breach of contract claim and the NYFSA claim. Also presently pending is a motion in limine by NOI to exclude the testimony of the Plaintiffs' expert, Warren Keegan, with regard to NPN's "lost profits."

For the following reasons, the Court (1) grants in part and denies in part the Plaintiffs' motion for partial summary judgment on their breach of contract claim; (2) grants in part and denies in part NOI's cross motion for partial summary judgment dismissing the Plaintiffs' breach of contract and NYFSA claims; and (3) reserves decision on the motion in limine to exclude the expert testimony of Keegan.

## I. BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 Statements and Counter–Statements and the exhibits in the record. Any genuine disputes of material facts are noted.

NPN is a Norwegian distributor of skin care, makeup, and health supplements in the Nordic region while NOI is a manufacturer and supplier of health supplement products sold under various trade names, including "Nature's Plus." In line with the business of its parent company, the primary trade of NPN was to distribute "Nature's Plus" brand health supplements to retailers in Scandinavia. Nature's Plus brand health supplements consist of various compilations of vitamins and other nutritional food items, often in pill or powder form. Although NPN shares a name with the health supplement brand, neither NPN nor its affiliates have a role in the production of these health supplements. Rather, they are independently manufactured by the Melville, New York based defendant NOI.

In December 2007, the newly-formed NPN (known then as Benevo) entered into a sole distributorship agreement with NOI (the "Agreement"). NOI drafted the Agreement and it was based upon a form contract that NOI typically uses with its international distributors. The Agreement provides that NPN would be the exclusive distributor of Nature's Plus brand products to retail stores in Norway, Sweden, Denmark, and Finland from 2008 through 2018. NPN's then-Business Development Manager, Lundestad, signed the contract on behalf of NPN. Dermagruppen, a Norwegian corporation that distributes cosmetic and health supplement products, is not a signatory to the Agreement.

The Agreement, which expressly terminated and superseded all previous oral and written agreements between NOI and NPN, provides in part: "In order for [NPN] to maintain the sole distributorship for the Products, [NPN] agrees that it will purchase and pay for Products from NOI [at] a minimum of . . . $600,000.00 during the first year [January 1, 2008 to December 31, 2008] of [the] agreement." (Agreement, Decl of Ernest D. Badway, Exh 7, at 1.). Under the

Agreement, this amount increases over time.  Further, "Products" is defined in the Agreement as "Nature's Plus products."  (Id.)

The Agreement also provides that the prices of the goods charged by NOI to NPN were to be 17.5% less than the wholesale prices listed on the Nature's Plus export order form.

The Agreement further includes a provision for "Advertising," which stated

> As partial consideration for the pricing discount offered to[NPN], [NPN] agrees to spend on Product advertising and promotion in each contract year no less than 5% of [NPN]'s net purchases of Products during the applicable contract year.  [NPN] shall produce paid invoices or other verification of such advertising/promotional expenditures as is reasonably satisfactory to NOI at NOI's request.

(Id. at 2.)

The Agreement also contains a section titled "Duration and Cancellation," which permitted NOI to terminate the Agreement for "breaches [of] any of the terms or conditions" of the Agreement only after providing thirty days "written formal notice" and an opportunity to cure the subject breach "to NOI's satisfaction at that time." (Id. at 5.)  The only sections of the Agreement that allowed fewer than thirty days' notice and an opportunity to cure were titled "Resale Restrictions" and "No Illegal Practices." (Id. at 4.)  Conversely, the Agreement permitted NPN to terminate the Agreement "at any time," but only upon one hundred and eight days prior written notice. (Id. at 5.)

The Agreement also contains a provision prohibiting NPN from assigning any of its rights under the Agreement, either directly or indirectly, without the prior written consent of NOI. (Id. at 5-6.)  However, the Agreement provides that, except as outlined in the no-assignment provision, the Agreement is "binding upon and shall inure to the benefit of NOI and [NPN] and their respective successors, assigns and legal representatives." (Id. at 6.)  Finally, the Agreement provides that "[a]ny failure by NOI to enforce [NPN]'s strict performance of any

provision of this Agreement will not constitute a waiver of NOI's right to subsequently enforce such provision or any other provision of th[e] Agreement." (Id.)

During the time period that the Agreement was in effect, NPN bought "Nature's Plus products" from NOI and also purchased products to be sold under other companies' private brand labels. The private label products were ultimately sold under the brand name Daily Wellness by a retail company called Life.

After signing the agreement, Lundestad remained at the head of NPN as Managing Director, when eight months later, Dermagruppen purchased NPN. Dermagruppen provided NPN with a much-needed infusion of cash through the execution of a convertible loan agreement. NPN concedes that it is still in existence today due to Dermagruppen's financial support.

Following the purchase, Lundestad did not remain Managing Director of NPN for long. While the company continued to distribute Nature's Plus brand products for the remainder of 2008, by years end, it had failed, by significant margins, to meet its annual sales goals. In January 2009, Dermagruppen asked Lundestad to take a demotion and become a sales manager for NPN, which Lundestad initially declined to do. However, after some legal wrangling, Lundestad ultimately signed a resignation agreement with the Plaintiffs, and ceased entirely to be employed by NPN, effective June 19, 2009.

However, within two months of having resigned from NPN, Lundestad was again running the sole distributor of Nature's Plus brand products in Scandanavia – but not at NPN. Rather, by letter dated August 6, 2009, NOI terminated its exclusive distributorship agreement with NPN, citing a failure to meet contractual minimum sales requirements for the 2008 calendar year. NPN made total payments of $718,648.10 between January 1, 2008 and December 31,

2008.  The parties dispute whether three categories of payments qualify towards the minimal sales requirement.  The Court describes these payments in turn.

First, NOI contends that the $58,028.96 in payments by NPN to NOI between January 1, 2008 and December 31, 2008 for "Products" as defined in the Agreement that were delivered in 2007 do not count toward the minimum sales requirement for 2008.  In support of that assertion, NOI contends that the phrase "purchase and pay for" as used in the "Sales Minimums" section of the Agreement means only "Products" that were both purchased and paid for during the January 1, 2008 through December 31, 2008 calendar year.

Second, NOI maintains that the $53,564.54 paid by NPN to NOI between January 1, 2008 and December 31, 2008 for private label products, shopping bags, and certain other selling aids do not count towards the minimum sales requirement.  Third, NOI alleges that shipping and freight costs do not count toward the minimum sales requirement.

If any one of these three amounts subtracted by NOI is counted toward the $600,000 sales minimum requirement, NPN would have exceeded its minimal sales obligations for 2008.

In terminating the Agreement, NOI did not provide NPN with thirty days written notice and an opportunity to cure the alleged breach.  According to NPN, not only is NOI's method of calculating the minimal sales requirement erroneous as a matter of contract interpretation, NOI failed to even disclose its method of calculating minimum sales to NPN until the discovery in this case.

On August 11, 2009, NOI publicly announced that the new exclusive distributor of Nature's Plus brand products in Scandinavia was HON, a business newly-formed by Lundestad. At this time, the Plaintiffs and Life were set to commence a large-scale launch of NOI's products pursuant to a strategic agreement.

6

On October 2, 2009, NPN and Dermagruppen commenced the present lawsuit against NOI, Lundestad, and HON. The Plaintiffs asserted claims against the Defendants under federal, New York State, and Norwegian law, including common law breach of contract, tortious interference with contract, breach of fiduciary duty, violation of New York and Norwegian business practice laws, and violation of federal unfair competition law.

On October 28, 2009, NOI answered the complaint, and asserted counterclaims against the Plaintiffs for breach of the Agreement and violation of the duty of good faith and fair dealing.

On January 26, 2011, the Court granted the Plaintiffs' motion to amend the complaint to add Organic as a Defendant. The Plaintiffs filed the amended complaint that same day. At the time of the amended complaint, Dermagruppen had acquired 96% ownership of NPN, but later acquired 100% ownership of NPN.

On February 9, 2011, NOI answered the amended complaint and asserted two counterclaims against the Plaintiffs. One such counterclaim arises from NOI's contention that the Plaintiffs materially breached the Agreement by, among other things, failing to satisfy the minimum purchase requirements.

Default judgments have been entered against Lundestad, Organic, and HON. However, to avoid inconsistent judgments, the Court has deferred calculations of damages with respect to the defaulting Defendants pending resolution of the Plaintiffs' claims against the non-defaulting Defendant, NOI.

On June 25, 2013, the Plaintiffs moved for partial summary judgment pursuant to Fed. R. Civ. P. 56 on their breach of contract claim. In short, the Plaintiffs contend that NOI breached the Agreement with NPN by terminating it (1) on a wrongful basis – that is, based on NOI's incorrect calculations of the minimum sales requirement and (2) without the required thirty days

written notice and opportunity to cure. On August 7, 2013, NOI cross-moved for partial

summary judgment pursuant to Fed. R. Civ. P. 56 dismissing the Plaintiffs' breach of contract

claim and the NYFSA claim. NOI has not moved for summary judgment on its breach of

contract counterclaim against NPN.

## II. DISCUSSION

A. <u>Legal Standard for Summary Judgment Motions</u>

Summary judgment is only appropriate where the moving party can demonstrate that there

is "no genuine dispute as to any material fact" and that the moving party is entitled to judgment as

a matter of law. Fed. R. Civ. P. 56(a). In considering this question, the Court considers "the

pleadings, depositions, answers to interrogatories and admissions on file, together with any other

firsthand information including but not limited to affidavits." <u>Nnebe v. Daus</u>, 644 F.3d 147, 156

(2d Cir. 2011); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.

Ed. 2d 265, 273 (1986); <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134 (2d Cir. 1997); <u>see</u> <u>also</u> Fed.

R. Civ. P. 56(c). "In assessing the record to determine whether there is a genuine issue to be tried

. . . the court is required to resolve all ambiguities and draw all permissible factual inferences in

favor of the party against whom summary judgment is sought." <u>McLee</u>, 109 F.3d at 134. The

burden of proving that there is no genuine issue of material fact rests with the moving party. <u>Gallo</u>

<u>v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994) (citing <u>Heyman v. Com.</u>

<u>& Indus. Ins. Co.</u>, 524 F.2d 1317, 1320 (2d Cir. 1975)). Once that burden is met, the non-moving

party must "come forward with specific facts," <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 73 (2d Cir.

1998), to demonstrate that "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party," <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514–15,

91 L. Ed. 2d 202, 218 (1986). "Mere conclusory allegations or denials will not suffice." <u>Williams</u>

v. Smith, 781 F.2d 319, 323 (2d Cir.1986).  Also "unsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

In contract cases, "summary judgment may be granted . . . only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  An agreement is ambiguous where "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Id.  "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." Id.  "[T]he mere assertion by a party that contract language means something other than what it clearly says is not sufficient to raise a triable issue of fact." 239 East 79th Owners Corp. v. Lamb 79 & 2 Corp., 30 A.D.3d 167, 168, 818 N.Y.S.2d 194, 195 (1st Dep't 2006).

B.  The Parties' Arguments

    1.  The Plaintiffs' Motion for Partial Summary Judgment

In their motion for partial summary judgment, the Plaintiffs make arguments related to the disputes concerning the minimum sales requirement as well as the lack of notice and opportunity to cure.  As to the former, the Plaintiffs assert that NOI's method of calculations, not previously disclosed to NPN, unilaterally read additional terms into the Agreement.  In particular, the Plaintiffs maintain that the Agreement does not exclude: (1) payments made in one year for Products order or delivered in another year; (2) payments for private label products derived from Nature's Plus branded products; or (3) payments made for freight or other costs

associated with the Products delivered. The Plaintiffs also assert that, even if none of these categories counted towards the minimum sales requirement, the parties shared an understanding that this requirement would be satisfied if NPN was within .5% of the stated minimum. Further, the Plaintiffs contend that NOI's continued acceptance of NPN's performance over eight months into the year 2009 evinces a waiver of any alleged breach related to the minimal sales requirement for the year 2008.

The Plaintiffs also insist that, even if NPN breached the Agreement by failing to satisfy the minimal sales requirement, NOI was contractually obligated to provide it with written notice and an opportunity to cure.

NOI opposes NPN's motion for partial summary judgment on several grounds. First, NOI disputes NPN's understanding of what purchases count for satisfying the minimal sales requirement. NOI asserts that at most, NPN raises issues of fact concerning its performance under the Agreement. Second, NOI casts the minimal sales requirement as a condition precedent to NPN's contractual right to maintain the exclusive distributorship. NOI notes that, in any event, because the breach of the minimal sales requirement was incurable, notice and opportunity to cure was futile and not required, as a matter of law.

In reply, the Plaintiffs contend that the minimal sales requirement did not constitute a condition precedent for which no required notice and opportunity was required. The Plaintiffs also assert that even if NPN's contractual right to maintain the exclusive distributorship was conditional on its satisfaction of the minimal sales requirement, the notice and opportunity to cure provision encompasses a breach of "any of the terms *or conditions* covered in th[e] [A]greement." (emphasis added).

2.  NOI's Motion for Partial Summary Judgment

In their motion for partial summary judgment, NOI first contends that Dermagruppen lacks standing to sue on the Agreement because it was neither a signatory nor a party thereto.  As to NPN's breach of contract claim, NOI asserts that not only does NPN fail to show that (1) it satisfactorily performed under the Agreement and (2) NOI did not, NPN fails to prove that it sustained legally recognizable damages – namely,  "lost profits" – as a result of the alleged breach.  NOI also seeks to dismiss the Plaintiffs' NYFSA claim on the ground that no "franchise fee" was contemplated under the Agreement or otherwise paid by NPN to NOI and therefore no "franchise" existed between NOI and NPN.

NPN opposes NOI's motion for partial summary judgment on several grounds.  First, NPN asserts that when Dermagruppen acquired 96% equity in Benevo, Dermagruppen effectively became NPN's legal successor, conferring all rights and delegating all obligations under the Agreement to Dermagruppen.  Second, NPN argues that the amount it was required to spend annually on advertising and promotion qualified as a "franchise fee" for purposes of the NYFSA.  Third, relying on its expert, Dr. Keegan, the Plaintiffs assert that they have provided evidence proving to a reasonable certainty the existence of "loss profits" due to NOI's breach of the Agreement.

C.  Analysis

Rather than addressing the respective motions for partial summary judgment separately, the Court will address the Plaintiffs' claim for breach of contract first, determining whether the claim should be granted, dismissed, or neither granted nor dismissed, and then address whether the Plaintiffs' NYFSA claim should be dismissed.

1. <u>As to the Plaintiffs' Claim for Breach of Contract</u>

Under New York law, which the parties agree governs the Plaintiffs' claim for breach of contract, the elements of the claim are a "contract, the plaintiff's performance under the contract, the defendant's breach, and damages resulting from the breach." <u>TNT USA Inc. v. DHL Exp. (USA), Inc.</u>, 09-CV-0481 (JS)(ARL), 2012 WL 601452, at *5 (E.D.N.Y. Feb. 23, 2012)

a. <u>As to Whether a Contract Existed Between the Parties</u>

NOI concedes that it had an agreement with NPN. However, NOI contests whether it had an agreement with Dermagruppen. While Dermagruppen's status as a non-signatory to the Agreement does not, by itself, preclude it from bringing a claim for breach of contract, neither does its status as a sole shareholder or parent company of NPN give it standing to sue. "Under New York law, the fact of corporate affiliation does not give an entity the right to bring a suit in its own name to remedy an injury to an affiliate." <u>AEP-PRI Inc. v. Galtronics Corp. Ltd.</u>, 12 CIV. 8981 PAE, 2013 WL 4400833, at *8 (S.D.N.Y. Aug. 13, 2013). "New York law bars parent corporations from bringing direct suits aimed at vindicating injuries suffered by their subsidiaries." <u>Id.</u>, citing <u>NAF Holdings, LLC v. Li & Fung (Trading) Ltd.</u>, No. 10 Civ. 5762(PAE), 2013 WL 489020, at *7 (S.D.N.Y. Feb. 8, 2013) (collecting cases).

Indeed, the Second Circuit has noted that a corporate subsidiary is a "separate corporation," and the parent company thus does not have any inherent "standing to assert [the subsidiary's] legal rights." <u>Hudson Optical Corp. v. Cabot Safety Corp.</u>, No. 97–9046, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998) (summary order). To hold otherwise would eviscerate the general rule that

> corporations have an existence separate and distinct from that of their
> shareholders, and an individual shareholder cannot secure a personal recovery for

> an alleged wrong done to a corporation. The fact that an individual closely
> affiliated with a corporation (for example, a principal shareholder, or even a sole
> shareholder), is incidentally injured by an injury to the corporation does not
> confer on the injured individual standing to sue on the basis of either that indirect
> injury or the direct injury to the corporation

New Castle Siding Co., Inc. v. Wolfson, 97 A.D.2d 501, 502, 468 N.Y.S.2d 20, 21 (2d

Dep't 1983)(internal citations omitted) aff'd, 63 N.Y.2d 782, 470 N.E.2d 868 (1984); see

also In re Beck Indus., Inc., 479 F.2d 410, 418 (2d Cir. 1973) ("Where a parent

corporation desires the legal benefits to be derived from organization of a subsidiary that

will function separately and autonomously in the conduct of its own distinct business, the

parent must accept the legal consequences, including its inability later to treat the

subsidiary as its alter ego because of certain advantages that might thereby be gained. In

short the parent cannot 'have it both ways.'"); Clarex Ltd. v. Natixis Sec. Am. LLC, No.

12 Civ. 0722 (PAE), 2012 WL 4849146, at *6 (S.D.N.Y. Oct.12, 2012) ("It is black-letter

law that one corporation cannot assert an affiliate's legal rights."); Pac. Elec. Wire &

Cable Co., Ltd. v. Set Top Int'l, Inc., No. 03 Civ. 9623 (JFK), 2005 WL 578916, at *8

(S.D.N.Y. Mar. 11, 2005) ("A parent corporation may not pierce the corporate veil in

order to assert the claims of its subsidiary.") (citation omitted)); but see Lumbermens

Mutual Casualty Co. v. Pennsylvania, 856 N.Y.S.2d 499 (table), 2008 WL 223274, at *3

(Sup. Ct. 2008) (stating in dictum that "parent company of a wholly owned subsidiary,

whose pecuniary interest is directly affected, has standing to prosecute and defend its

subsidiary's claims.") rev'd and remanded, 52 A.D.3d 212, 859 N.Y.S.2d 146 (1st Dep't

2008)

  The Plaintiffs contend that Dermagruppen is a "successor" to NPN under the

Non-Assignment Clause of the Agreement, emphasizing Dermagruppen's total

acquisition of NPN; NOI's acquiescence in that acquisition; and the subsequent integration of NPN into the Dermagruppen family of companies. Indeed, the Plaintiffs point to the fact that the August 2009 termination letter was addressed to Henning Nielsen, Chief Executive Officer of Dermagruppen.

However, absent a formal merger in accordance with Article 9 of the New York Business Corporation Law, a parent company may not enforce the contract of its wholly-owned subsidiary. A. Servidone, Inc. v. Bridge Tech., 280 A.D.2d 827, 829–830, 721 N.Y.S.2d 406 (3d Dep't 2001)(successor corporation that performed no work on the property could not assert lien in its own name for work done by predecessor company), lv. denied 96 N.Y.2d 712, 729 N.Y.S.2d 439, 754 N.E.2d 199 (2001). In fact, in A. Servidone, Inc., the Third Department rejected a parent's company's argument that its subsidiary "essentially merged" into the parent because the subsidiary had subsequently dissolved. Here, the fact that NPN retained its separate existence only cuts against a finding that Dermugruppen acquired NPN's rights under the Agreement. For that matter, NPN is a party to this litigation and it is unclear how both NPN and Dermagruppen could simultaneously seek redress for the same underlying claim.

Equally unavailing is the Plaintiffs' attempt to invoke the *de facto* merger doctrine. New York law recognizes a *de facto* merger "when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser." Cargo Partner AG v Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003) (internal quotation marks omitted). A *de facto* merger occurs "when the acquiring corporation has not purchased another corporation merely for the purpose of holding it as a subsidiary, but rather has effectively merged with the acquired corporation." Fitzgerald v Fahnestock & Co., 286 A.D.2d 573, 574, 728 N.Y.S.2d 96 (1st Dep't

2001).  Underlying the *de facto* merger doctrine is the concept that "a successor that effectively takes over a company in its entirety should carry the predecessor's liabilities as a concomitant to the benefits it derives from the good will purchased." Id. at 575.  Although, under the *de facto* merger doctrine, the successor entity attains benefits in the form of goodwill and other intangible assets, the Plaintiffs point to no case where the *de facto* merger doctrine was used to confer upon a successor entity contractual rights to sue.

It bears noting that "the de facto merger doctrine is rooted in equity, and has the purpose of avoiding 'patent injustice which might befall a party simply because a merger has been called something else.'" Holme v. Global Minerals & Metals Corp., 22 Misc. 3d 1123(A), at *5, 880 N.Y.S.2d 873 (Sup. Ct. 2009) aff'd, 63 A.D.3d 417, 879 N.Y.S.2d 453 (1st Dep't 2009); see also Matter of New York City Asbestos Litigation, 15 AD3d 254, 258, 789 N.Y.S.2d 484 (1st Dep't 2005)(purpose of doctrine is "to ensure that a source remains to pay for the victim's injuries). The Court identifies no equitable reason to expand the scope of the *de facto* merger doctrine to encompass acquiring entities like Dermagruppen, particularly given that that the acquired entity, NPN, is a party to the instant case and brings the same underlying breach of contract claim. Accordingly, the Court denies that part of NPN's motion for partial summary judgment on Dermagruppen's claim for breach of contract and grants that part of NOI's motion for partial summary judgment dismissing Dermagruppen's claim for breach of contract.

   b.   As to the NPN's Performance Under the Agreement

NOI contends that NPN did not perform under the Agreement by satisfying the minimal purchase requirements for the year 2008.  Again, three general categories of items are in dispute.

The first category of disputed payments concerns whether NPN can satisfy the minimal purchase requirements if it purchases and pays for the items in the same calendar year.  The

second category of disputed payments concerns whether certain selling aids, including shopping bags, electric window signs, vitamin traveletts, and power shaker cups, as well as private label products, qualified as "Products" under the Agreement.  The third category of disputed payments concerns whether freight and shipping costs count towards the minimal sales requirement.

The Court need not resolve these disputes because the Court finds that, as a matter of law, even if the Court accepted NOI's interpretation of the Agreement on these three disputed categories, NPN provided substantial performance of the minimal sales requirement.  As noted above, even after deducting the disputed payments from NPN's total payments between January 1, 2008 and December 31, 2008, it is undisputed that NPN's total payments for that time period were $597,031.02, less than $3,000 short of the contractually-required amount of $600,000.

"[A] breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract." Barbagallo v. Marcum LLP, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013).  Several factors bear on whether a party has substantially performed under a contract, including "the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance." CSC Recovery Corp. v. Daido Steel Co., Ltd., No. 94 Civ. 9214 (LAP), 2000 WL 134578, *6 (S.D.N.Y. Feb. 4, 2000) (quoting Hadden v. Consolidated Edison Co. of New York, Inc., 34 N.Y.2d 88, 96, 312 N.E.2d 445 (1974)).

The Court is mindful that "[t]he issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186-87 (2d Cir.

2007)(citing <u>Anderson Clayton & Co. v. Alanthus Corp.</u>, 91 A.D.2d 985, 985, 457 N.Y.S.2d 578 (2d Dep't 1983)).  That said, the Court notes that NPN performed approximately 99.5% (597/600) of its obligations under the minimal sales requirement.  Further, NOI and NPN have good faith disputes over the meanings of the items that qualify towards the minimal sales requirement, some of which did not come to light until discovery.  In this regard, the fact that NOI failed to provide notice and opportunity to cure to NPN – though not necessarily required by the Agreement for this alleged breach – suggests that any breach by NPN of the minimal sales requirement was not willful.  Under these circumstances, the Court finds that as a matter of law NPN substantially performed its obligations with respect to the minimal sales requirement.

To be sure, this conclusion does not foreclose NOI from recovering on its counterclaim for breach of contract, a claim for which neither NOI nor NPN move for summary judgment. <u>F. Garofalo Elec. Co., Inc. v. N.Y. Univ.</u>, 300 A.D.2d 186, 188-89, 754 N.Y.S.2d 227  (1st Dep't 2002) (holding that "[i]f [plaintiff] substantially performed its contractual obligations, then it would be entitled to the payment due under the contract less the cost of any correction of defects in its performance," even if it breached the contract).

NOI separately argues that NPN failed, as required by the Agreement, "to spend on Product advertising and promotion in each contract year no less than 5% of [NPN's] net purchases of Products during the applicable contract year."  NOI's notice of termination was limited to NPN's alleged failure to satisfy the minimal sales requirement.  However, NOI's counterclaim for breach of contract does allege that NPN failed to advertise and promote the Products for the year 2008 as required by the Agreement.

The question then becomes whether NOI can defeat NPN's breach of contract claim on the grounds that NPN failed to perform under the Agreement -- that is, failed to advertise and

promote the Products – notwithstanding NOI's failure to include this reason as a basis for its notice of termination.  In order for NOI to terminate the Agreement on a certain basis and to be relieved of its obligations thereunder, NOI was required to provide thirty days written notice of "such breach," regardless of whether the breach could be cured within that time frame.  However, whether NOI could properly terminate the Agreement on this basis, or whether NOI could prevail on its breach of contract claim on this basis, present separate issues from the question here, namely: whether NOI can defeat NPN's breach of contract claim due to NPN's alleged failure to advertise notwithstanding NOI's failure to previously specify this reason as a basis for its notice of termination.

Neither party proffers case law on this issue.  Again, under New York law, a breach of contract claim is properly alleged where the plaintiff pleads "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." <u>Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC.</u>, 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012) (quoting <u>JP Morgan Chase v. J.H. Elec. of N.Y. Inc.</u>, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (2d Dep't 2010)).  The language of this rule suggests that, in order to prevail on a breach of contract claim, a plaintiff must establish performance of each of its obligations under the contract, not just those obligations that the defendant previously cited as a basis for termination.

Having determined that NPN's alleged failure to advertise under the Agreement could serve as a basis to defeat NPN's breach of contract claim, the Court now considers whether a genuine issue of material fact exists as to this issue.  According to NOI, NPN's advertising expenditures involved NPN returning to customers a certain percentage of the purchase price (referred to by the customer as "kickbacks").  In consideration for these "kickbacks," the

18

customer would simply include some of NPN's products in its own advertising for its retail stores. However, NOI notes, those ads also included products that were not Nature's Plus brand products, but were actually competing brands as well as the store's private label brand. NPN disputes these assertions, and the Court is not now prepared to grant summary judgment to either party on this issue. Accordingly, the Court finds that a genuine issue of material fact exists regarding whether the Plaintiff performed under the Agreement in satisfying the advertising and promotion requirement.

In sum, the Court finds that, as a matter of law, NPN substantially performed its obligations with respect to the minimal sales requirement for the year 2008, but that genuine issues of material fact exists as to whether NPN performed its obligations with respect to the advertising requirement of the Agreement.

### c. As to NOI's Performance Under the Agreement

The Court next considers whether genuine issues of material fact exist as to whether NOI breached the Agreement by terminating it (1) on a wrongful basis and/or (2) without notice and opportunity to cure.

As to the first basis, the Court observes that "[t]he substantial performance rule precludes contract termination and limits a contracting party to a specific damage remedy." 845 UN Ltd. P'ship v. Flour City Architectural Metals, Inc., 28 A.D.3d 271, 272, 813 N.Y.S.2d 404, 405 (1st Dep't 2006). Applying that principle here, the Court finds that NPN's substantial performance of the minimal sales requirement during the year 2008 precluded NOI from terminating the Agreement on that basis. In this regard, NOI's termination of the Agreement on this basis constituted a breach of the Agreement. Because the Court concludes that NOI wrongfully terminated the Agreement, the Court need not address whether NOI also breached the Agreement

by failing to provide an opportunity to cure the apparent breach of the minimal sales requirement.

>    d.  <u>Damages</u>

NPN asserts that it would have generated approximately $13 million in "lost profits" for the period 2009 through 2017 had the Agreement not been terminated in August 2009. In support of this assertion, NPN relies on the expert report and deposition testimony of Warren J. Keegan, Ph.D. Dr. Keegan is a Professor of marketing and business at Pace University who has published in leading journals in his field. To calculate NPN's "lost profits," Dr. Keegan utilized existing sales data for what he claims was a competing product line, Solaray, that Life had previously announced would be replacing with comparable NOI products from NPN. In addition, Life executive Thor Solvang estimated the sales for new, non-comparable NOI products. Dr. Keegan then applied assumptions based on Life market share in the Nordic region which he drew in part from the testimony of Hallgeir Andal, founder and former Chief Executive Officer of Life.

"Under New York law, a claimant may recover lost profits for breach of contract if it can demonstrate that such damages were caused by the breach, that the alleged loss is capable of proof with reasonable certainty, and that the damages were within the contemplation of the parties at the time the contract was made." <u>The Upper Deck Co., LLC v. Breakey Int'l, BV</u>, 390 F. Supp. 2d 355, 358 (S.D.N.Y. 2005) (citation omitted). While such damages "need not be proven with 'mathematical precision,' "they must nevertheless be "'capable of measurement based upon known reliable factors without undue speculation.'" <u>Schonfeld v. Milliard</u>, 218 F.3d 164, 172 (2d Cir. 2000) (quoting <u>Ashland Mgmt. Inc. v. Janien</u>, 82 N.Y.2d 395, 403, 624 N.E.2d 1007 (1993). Indeed, "a plaintiff is entitled to recover lost profits only if he can establish

both the existence <u>and</u> amount of such damages with reasonable certainty." <u>Schonfeld v. Hilliard</u>, 218 F.3d at 172 (emphasis added).

Moreover, "damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." <u>Kenford Co. v. County of Erie</u>, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). Failure to demonstrate such non-speculative damages will result in summary judgment in favor of the defendant. <u>See</u> <u>Upper Deck</u>, 390 F. Supp. 2d at 362.

That Court acknowledges that "[s]ince [NPN] never made any profits . . . there is no profit record to serve as a basis for projecting millions of dollars in future profits." <u>Awards.com, LLC v. Kinko's, Inc.</u>, 42 A.D.3d 178, 185, 834 N.Y.S.2d 147 (1st Dep't 2007) <u>aff'd</u>, 14 N.Y.3d 791, 925 N.E.2d 926 (2010); <u>Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.</u>, No. 98 Civ. 5101 (SHS), 2004 WL 1574629 at *7 (S.D.N.Y. July 14, 2004)(summary judgment dismissing lost profits claim, as business "did not have one profitable quarter from 1995-1997," was trying to enter new segments of the market and it "could not have accurately predicted how successful its new business strategies would be"). In fact, "[t]he only fact in the record bearing directly on [NPN]'s profitability is [NPN]'s record of losses in each year of its short existence." <u>Allard v. Arthur Andersen & Co. (USA)</u>, 924 F. Supp. 488, 494 (S.D.N.Y. 1996); <u>24/7 Records, Inc. v. Sony Music Entm't, Inc.</u>, 566 F. Supp. 2d 305, 316 (S.D.N.Y. 2008) ("Indeed, there is no evidence that 24/7 or the LLC ever made a profit, and there is no reliable, non-speculative means of ascertaining whether the business could have become profitable during the one and one-half years remaining under the exclusive distribution period of the agreement."); <u>Upper Deck Co.</u>, 390 F. Supp. 2d at 360 ("The data on which [the economist] relies provide an insufficient historical record upon which to project future earnings."); <u>Int'l Telecom, Inc. v. Generadora</u>

Electrica del Oriente, No. 00 Civ. 8695(WHP), 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13, 2004) (denying lost profits where the plaintiff "[sought] to project eight years of lost profits based on only two months revenues in a new business venture"); Ciraolo v. Miller, 138 A.D.2d 443, 444, 525 N.Y.S.2d 861, 862 (2d Dep't 1988)(one-month profit history is unduly speculative basis for award of twelve months' lost profits).

However, the Second Circuit has made clear that "[p]ast losses do not necessarily negate any expectation of future profits." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 24 (2d Cir. 1997)("The fact that Alghanim lost $6.65 million over ten years does not make the arbitrator's award of future lost profits of $46 million 'completely irrational.'"); see also Lamborn v. Dittmer, 873 F.2d 522, 533 (2d Cir. 1989) ("[W]e reject outright the suggestion in Dittmer's papers that a business with no history of profits is necessarily valueless.").

Absent a track record of earnings, profits may be based on the comparable sales of a competitor, at least in the context of new businesses.  See Care Travel Co., Ltd. v. Pan American World Airways, Inc., 944 F.2d 983, 994–95 (2d Cir. 1991) (allowing lost profits damages where plaintiff estimated that it would have made the same amount of sales as a third party that sold tickets on behalf of the defendant in breach of the parties' agreement that the plaintiff would have exclusive right to sell plaintiff's tickets); see also Travellers Int'l v. Trans World Airlines, Inc., 41 F.3d 1570, 1579 (2d Cir. 1994); Americana Fabrics, Inc. v. Liebhardt Mills, Inc., 2000 WL 245889, *2 (S.D.N.Y. 2000).  Although NPN was not a "brand new" business at the time of NOI's wrongful termination in July 2009, it bears emphasis that NPN or Benevo was established only two years prior, in 2007.

Whether and to what extent Solaray products are comparable to NPN's products, or are a reliable indicator of NPN's profitability, cannot be decided at the summary judgment stage.

22

The Court also notes NPN proffers evidence indicating that Life had committed to removing from its shelves NPN's competitor products and Dermagruppen, with its significant financial resources, had acquired NPN, and these facts may tend to suggest the existence, albeit not the amount, of future profits. For these reasons, the Court finds that a material issue of fact exists regarding the existence and amount of "lost profits," if any, owed to NPN as a result of NOI's wrongful termination.

    2.  <u>As to the Plaintiffs' NYFSA Cause of Action</u>

The Court next turns to the Plaintiffs' cause of action under the NYFSA. According to NOI, the Agreement did not contemplate a "franchise" under the NYFSA and therefore that statute is inapplicable.

The NYFSA defines "franchise" as follows:

> 'Franchise' means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which
>
> (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or
>
> (b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.

New York General Business Law § 681(3).

Here, the Agreement provided NPN the right to distribute NOI's goods under a marketing plan prescribed in substantial part and/or goods that are substantially associated with NOI's trademarks. However, NOI asserts that no "franchise" exists within the meaning of the NYFSA

because the Agreement does not provide for a "franchise fee" from NPN to NOI. General Business Law § 681(7) defines a "franchise fee," in pertinent part, as follows:

> any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay directly or indirectly for the right to enter into a business under a franchise agreement or otherwise sell, resell or distribute goods, services, or franchises under such an agreement, including, but not limited to, any such payment for goods or services.

NOI notes that "[t]he purchase or agreement to purchase goods at a bona fide wholesale price [is] not a franchise fee." Id. However, the Plaintiffs do not contend that this payment constitutes a "franchise fee" for purposes of the NYFSA. Instead, the Plaintiffs point to NPN's contractual obligation to "spend on Product advertising and promotion in each contract year no less than 5% of Distributor's net purchases of Products during the applicable contract year." See Luzim v. Phillips, 1987 WL 30214, * 3 (E.D.N.Y. Dec. 10, 1987) (holding that a distributor's payment to an advertising fund of a sum equal to 3% above the United States wholesale price of the supplier's goods bought by the distributor satisfied the required "franchise fee" payment for purpose of creating a franchise between the supplier and the distributor).

In the Court's view, nothing in the NYFSA requires that a "franchise fee" be paid directly from a franchisee to a franchisor. Indeed, the NYFSA specifically provides that a "franchise fee" may be paid "directly or indirectly." This interpretation is consistent with the "New York's definition of a franchise [as] among the broadest in the country." Aristacar Corp. v. Attorney General, 143 Misc. 2d 551, 552, 541 N.Y.S.2d 165 (Sup. Ct. 1989).

That said, NPN's NYFSA cause of action fails as a matter of law because the advertising requirement was expressly made as "partial consideration" for the 17% pricing discount NPN

received under the Agreement.  In other words, NPN did not make the advertising payments "<u>for</u> the right to enter into a business under a franchise agreement or otherwise sell, resell or distribute goods, services, or franchises under such an agreement." General Business Law § 681(7)(emphasis added).  Moreover, this 5% advertising expenditure did not cause NPN to pay NOI more than the wholesale price for the goods.  In fact, NPN still received a net 12.5% discount from NOI's bona fide wholesale prices so that the 5% did not represent any additional "fee" above the wholesale prices.

Accordingly, the Court grants that part of NOI's motion for partial summary judgment dismissing the Plaintiffs' claim under the NYFSA.

## III.  CONCLUSION

In sum, with respect to the Plaintiffs' breach of contract cause of action, the Court finds that, as a matter of law, the Plaintiffs failed to prove the existence of a contract between Dermagruppen and NOI.  Therefore, the Plaintiffs' motion for partial summary judgment on Dermagruppen's breach of contract claim is denied and that part of NOI's motion for partial summary judgment dismissing Dermagruppen's breach of contract claim is granted.

The Court further finds as a matter of law that NPN substantially performed its obligations with respect to the minimal sales requirement for the year 2008, but that genuine issues of material fact exists as to whether NPN performed its obligations with respect to the advertising requirements of the Agreement.  Thus, at the trial, to succeed on its breach of contract claim, NPN will be required to prove, by a preponderance of the evidence, that it complied with the advertising requirements of the Agreement.

The Court also finds as a matter of law that NOI breached the Agreement by terminating it on a wrongful basis – namely, NPN's apparent failure to comply with the minimal sales requirement.

The Court also denies that part of NOI's motion for partial summary judgment dismissing NPN's claim for "lost profits" in NPN's breach of contract claim.

Finally, the Court grants that part of NOI's motion for partial summary judgment dismissing the Plaintiffs' claim under the NYFSA.

For the foregoing reasons, it is hereby

**ORDERED**, that the Plaintiffs' motion for partial summary judgment on their breach of contract claim is granted in part and denied in part as set forth above; and it is further

**ORDERED**, that NOI's motion for partial summary judgment on the Plaintiffs' breach of contract and NYFSA claims is granted in part and denied in part as set forth above; and it is further

**ORDERED**, that the Court reserves decision on the motion in limine to exclude the expert testimony of Keegan.


**SO ORDERED.**
Dated: Central Islip, New York
November 6, 2013


_____*Arthur D. Spatt*_____ _
　　ARTHUR D. SPATT
　　United States District Judge