UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
NATURE'S PLUS NORDIC A/S,

                Plaintiff,

        -against-

NATURAL ORGANICS, INC., HOUSE OF
NATURE A/S, ORGANIC HOUSE A/S, and
HANS KARE LUNDESTAD,

                Defendants.
---------------------------------------------------------X

**FILED**
**CLERK**

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF
DECISION AND ORDER**
09-cv-4256 (ADS)(AKT)

**APPEARANCES:**

**Fox Rothschild LLP**
*Attorneys for the Plaintiff*
997 Lenox Drive Bldg. 3
Lawrenceville, NJ 08648
    By: Ernest E. Badway, Esq.
        Christopher R. Kinkade, Esq.
        Gerard P. Norton, Esq., Of Counsel

**Meyer, Suozzi, English & Klein, P.C.**
*Attorneys for the Defendant Natural Organics, Inc.*
990 Stewart Avenue, Suite 300
Garden City, NY 11530
    By: Kevin Schlosser, Esq.
        Daniel B. Rinaldi, Esq.
        Michael J. Antongiovanni, Esq., Of Counsel

**NO APPEARANCES:**

*The Defendants House of Nature A/S; Organic House A/S; and Hans Kare Lundestad*

**SPATT, District Judge.**

        Familiarity with the factual and procedural history of this case is presumed.

        On October 2, 2009, the Plaintiff Nature's Plus Nordic A/S ("NPN" or the "Plaintiff")

commenced this action asserting various state law claims against the Defendant Natural

Organics, Inc. ("NOI") and the former Defendants House of Nature A/S ("House of Nature"),

1

Hans Kare Lundestad ("Lundestad"), and Organic House A/S ("Organic House"), including breach of contract based on a Distributorship Agreement entered into between NPN (then known as Benevo A/S) and NOI. NPN also raised a claim for a violation of the New York Franchise Sales Act ("NYFSA"), General Business Law §§ 681 *et seq*.

On September 21, 2011, the Court entered a default judgment against Organic House, but to avoid inconsistent judgments, deferred calculation of damages pending resolution of NPN's claims against the non-defaulting Defendants.

On February 7, 2012, the Court entered a default judgment against House of Nature and Lundestad but again, to avoid inconsistent judgments, deferred calculation of damages pending resolution of NPN's claims against the non-defaulting Defendant, NOI.

On November 6, 2013, as relevant here, the Court granted in part and denied in part a motion by NOI for partial summary judgment dismissing NPN's breach contract and NYFSA claims.

On August 29, 2014, at the Court's request, the parties submitted a stipulation for the trial amending the caption to remove the defaulting Defendants.

On September 2, 2014, the Court "So Ordered" that stipulation.

The Court held a jury trial from January 7, 2015 through January 23, 2015.

At the trial, NPN offered an exhibit, marked no. 84, that enumerated the specific amounts it sought as "Out-of-Pocket" expenses in reliance upon the contract. The exhibit listed "Payment of Debt" as $2,964,481; "Advertising of [Nature's Plus Products in 2008] as $741,772; "Advertising of [Nature's Plus Products in 2009]" as $163,739; "Products in Inventory when [NOI] Breached" as $430,079; and "Employee Severance Pay" as $133,192 for a total of $4,433,263. NPN also sought lost profits.

On January 23, 2015, a unanimous jury verdict was rendered in favor of NPN in the amount of $4,433,263, the precise amount listed in Exhibit 84, for "out of pocket expenses during the term of the contract to August 6, 2009" which NOI breached. The jury awarded zero damages to NPN for alleged lost profits during the term of the contract, from 2009 to 2017.

Thereafter, NPN made an oral motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50 for judgment as a matter of law. The Court denied that motion, but granted NPN's request to reserve its right to file a formal Rule 50 motion. Counsel for NOI expressed his intention to make a Rule 50 and Rule 59 motion within 28 days of the entry of judgment as required by those rules.

On February 6, 2015, NPN moved for (1) entry of judgment in the amount of $4,433,263 based on the January 23, 2015 verdict; (2) pre-judgment interest in the amount of

$2,667,213.69 as provided by Section 5001, *et seq*., of the New York Civil Practice Law and Rules ("CPLR"); (3) post-judgment interest at the statutory rate calculated from the date of the entry of the judgment pursuant to 28 U.S.C. § 1961(a); and (4) costs in the amount of $629,582.53 pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and Local Civil Rule 54.1.

On February 13, 2015, NPN filed an amended motion for (1) entry of judgment in the amount of $4,433,263 based on the January 23, 2015 verdict; (2) pre-judgment interest in the amount of $2,180,801.01; (3) post-judgment interest at the federal statutory rate calculated from the date of the entry of the judgment; and (4) costs in the amount of $150,272.83.

On February 20, 2015, NOI moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law, or, in the alternative, pursuant to Fed. R. Civ. P. 59 for a new trial.

By order dated February 21, 2015, the Court granted that part of NPN's motion dated February 6, 2015 seeking entry of judgment in the amount of $4,433,263 based on that jury verdict. The Court denied as duplicative NPN's amended motion dated February 13, 2015 seeking entry of judgment in the amount of $4,433,263 based on the January 23, 2015 jury verdict. The Court reserved decision on the other pending motions.

On February 24, 2015, the Clerk of the Court entered judgment based on the verdict.

On March 6, 2015, NOI appealed the judgment to the United States Court of Appeals for the Second Circuit.

On March 9, 2015, NOI moved by order to show cause pursuant to Fed. R. Civ. P. 62(d) for (1) approval of its *supersedeas* bond in the amount of $4,433,263 and (2) granting a stay of execution of the judgment pending resolution of NOI's appeal to the Second Circuit.

On March 10, 2015, the Court issued an order directing NPN not to execute on the judgment or initiate proceedings to enforce the judgment pending resolution of NOI's March 9, 2015 motion.

On March 11, 2015, NPN filed a letter indicating that it would not be filing an opposition to the NOI's motion by order to show cause.

On March 13, 2015, the Court (1) granted NOI's motion by order to show cause; (2) approved the *supersedeas* bond; and (3) stayed NPN from executing on the judgment pending resolution of NOI's appeal to the Second Circuit.

On March 26, 2015, NPN moved pursuant to Fed. R. Civ. P. 55(B)(2) for entry of judgment awarding it (1) damages in the amount of $4,433,263 as determined by the jury's verdict of January 23, 2015; (2) pre-judgment interest in the amount of $2,180,801.01, as provided by Section 5001, *et seq*., of the CPLR; (3) damages in the amount of $136,670.02 for the claims contained in Counts 5 through 11 of the First Amended Complaint, dated January 26, 2011; (4) punitive damages in the amount of $136,670.02 based upon the First Amended Complaint; (5) attorneys' fees and costs in the amount of $1,189,954.40; (6) post-judgment

interest at the federal statutory rate calculated from the date of the entry of the judgment; and (7) costs in the amount of $150,272.83 pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and Local Civil Rule 54.1.

On March 27, 2015, the Court (1) vacated the "So Ordered" September 2, 2014 stipulation; (2) directed the Clerk of the Court to reinstate House of Nature, Organic House, and Lundestad as Defendants in this action; (3) denied as unnecessary that part of the March 26, 2015 motion for entry of judgment based on the jury verdict in light of the February 24, 2015 entry of judgment; (4) reserved decision on that part of the March 26, 2015 motion seeking pre-judgment interest; and (5) and referred the balance of the requested relief in the March 26, 2015 motion to United States Magistrate Judge A. Kathleen Tomlinson for a recommendation as to whether damages should be awarded, including reasonable attorneys' fees, costs, and interest against House of Nature, Organic House, and Lundestad.

The Rule 50 and 59 motions are fully briefed, as is the amended motion for pre-judgment interest, post-judgment interest, and costs, which the Court considers in turn.

For the reasons set forth, (1) NOI's Rule 50 motion is granted in part and denied in part; (2) NOI's Rule 59 motion is denied; and (3) NPN's motion for pre-judgment interest, post-judgment interest, and costs is denied without prejudice to renew in accordance with the Court's rulings on NOI's Rule 50 motion.

## I. DISCUSSION

A. <u>The Rule 50 Motion</u>

Rule 50(a) provides for the entry of a judgment as a matter of law on any issue, before submitting the matter to a jury, where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Such a motion may, as here, be renewed after trial under subsection (b) of that Rule.

A court may grant a motion under Rule 50(b) "only if after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict." <u>Fabri v. United Technologies Int'l, Inc.</u>, 387 F.3d 109, 119 (2d Cir. 2004). Importantly, the trial court "cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit." Id.; <u>Barrella v. Vill. of Freeport</u>, 43 F. Supp. 136, 173 (E.D.N.Y. Aug. 28, 2014)(quoting <u>Fabri</u>).

In this case, Henning Nielsen, Chief Executive Officer of Dermagruppen, which had acquired 96% ownership of NPN at the time of the amended complaint and later 100% ownership, testified that NPN, prior to NOI's breach, spent $741,772 in 2008 and $163,739 in 2009 on advertising and marketing activities that included the purchase of promotional materials that instantly became useless as a result of the breach. (Trans. 256-260.) Similarly,

Nielsen testified that NPN's product inventory, with a market value of $450,000 at the time of the breach, had to be discarded because NOI refused to take the inventory back. (Id. a 280-82.)

Here, NOI first challenges the award of out-of-pocket expenses, including for certain advertising costs, unsold inventory, and severance pay, on the basis that the expenses were paid with money borrowed from non-parties such as NPN's parent company, the former Defendant Dermagruppen, and were never repaid. In this regard, NOI contends that an award of out-of-pocket expenses under these circumstances runs contrary to the well-established principle of contract damages that a non-breaching party cannot be placed in a better position than it would have occupied had the breach not occurred.

Relatedly, NOI relies on the prior holding of this Court that "[Dermagruppen's] status as a sole shareholder or parent company of NPN [does not] give it standing to sue. . . . The fact that . . . a principal shareholder . . . is incidentally injured by an injury to the corporation does not confer . . . standing to sue on the basis of either that indirect injury or the direct injury to the corporation . . . ." Nature's Plus Nordic A/S v. Natural Organics, Inc., 980 F. Supp. 2d 400, 409 (E.D.N.Y. 2013)(internal quotation marks omitted).

NOI previously made this argument before the issuance of jury instructions (Doc No. 331, at 3.). However, the Court did not issue a jury instruction requiring NPN to prove that the

expenditures for which it sought reimbursement were actually paid from its own funds, rather than through loans or advances from non-parties, which it never repaid.

United States District Judge Shira A. Scheindlin recently delineated the two different forms of redress under New York law in breach of contract suits, namely, "expectation damages" and "reliance damages."

> Expectation damages provide the injured party with the benefit she would have enjoyed had no breach occurred— i.e., they aim to fulfill the injured party's expectations from the contract.13 Reliance damages, by contrast, seek to restore the injured party to the position she was in before the contract was formed. They allow for recovery of "expenditures [the injured party] made in reliance on defendant's representations and that he otherwise would not have made." Under New York law, when expectation damages defy precise calculation, reliance damages are the appropriate remedy.

World of Boxing LLC v. King, No. 14–cv–3791 (SAS), 2015 WL 427225, at *2 (S.D.N.Y. February 2, 2015)(citations omitted).

Indeed, reliance damages "are about restoration" and "strive to "place [injured parties] in the same position as they were prior to the execution of the contract," not to bestow a "windfall" on injured parties." Id. at *5 (citation and quotation marks omitted); see U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 696 (2d Cir. 1991)("Since the purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach, those damages are generally measured by the plaintiff's actual loss. While on occasion the defendant's profits are used as the measure of damages, this generally occurs when those

profits tend to define the plaintiff's loss, for an award of the defendant's profits where they greatly exceed the plaintiff's loss and there has been no tortious conduct on the part of the defendant would tend to be punitive, and punitive awards are not part of the law of contract damages." (citations omitted)); Freund v. Washington Square Press, Inc., 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974)("Money damages are substitutional relief designed . . . to put the injured party in as good a position as he would have been put by full performance of the contract, at the least cost to the defendant," and "the injured party should not recover more from the breach than he would have gained had the contract been fully performed." (citations and internal quotation marks omitted)).

Relatedly, "[r]eliance damages concern money spent by the plaintiff in preparation for or partial performance of the agreement, not investments made by third parties." 24/7 Records, Inc. v. Sony Music Entm't, Inc., 566 F. Supp. 2d 305, 319 (S.D.N.Y. 2008).

However, as NOI appears to concede (Doc No. 365, at 5.), an individual or entity's undertaking of debt obligations as opposed to investments in reliance upon a contract, whether from a third party or the contractual counterpart, are recoverable under New York law. See Elvin Assocs. v. Aretha Franklin, 735 F. Supp. 1177, 1183 (S.D.N.Y. 1990)(reliance damages were awarded to a musical producer, who relied on Aretha Franklin's promise to star in a musical, for custom-made costumes, a $12,500 production fee, the amounts paid to the

composer, unpaid debts to a collaborator and choreographer, and debts to potential investors for $72,155, which they lost in the failed venture); <u>McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.</u>, No. 89 CIV. 1489 (PNL), 1990 WL 138959, at *9 (S.D.N.Y. Sept. 19, 1990)("Jetborne has proved by a preponderance of the evidence, first, that Jetborne incurred a debt to McKinley of $250,000 and failed to redeem the debt when that was possible in reasonable reliance upon McKinley's 'highly confident' letter and contractual obligation to use its best efforts to secure financing of the Allmat acquisition, which obligation McKinley breached. Second, Jetborne has proved that but for McKinley's breached promises it would not have incurred that debt,and third, that McKinley could reasonably have foreseen that Jetborne would incur this obligation in reliance.")

In this case, there is some confusion over whether the monies transferred from Dermagruppen to NPN, which were used to pay for certain of NPN's operating expenses, were in the form of a debt, an investment, or some other form.

In its post-trial papers, NPN states it "has not alleged that it assumed any debt of Dermagruppen, nor did it," presumably in part because NPN takes the position that the form and source of the funds is legally irrelevant. (Doc No. 355, at 6.) However, this position seems to be at odds with some of the testimony cited later including that of one of its witnesses, Berit Abrahamsen, an NPN executive.

However, if NPN is asserting that these monies were investments of some kind by Dermagruppen in NPN, then, consistent with the decision in 24/7 Records, they would not be recoverable as reliance damages to NPN, even if NPN sought this investment in reliance on the contract.

NOI characterizes the subject money transfers as "loan[s] or (source of funds)[.]" (Doc No. 365, at 3.) At other points, NOI describes the transfers as "loan[s]"or "loan proceeds" but simultaneously claims that the evidence showed there was no money owing. (Id. at 5-7, 10).

Relevant here, Nielsen testified in questioning by counsel for NPN:

Q: Mr. Nielsen, when you acquired NPN, what if any debt did NPN have?
A: About $500,000 in unpaid bills.
Q: And what did you do with the unpaid bills of NPN?
A: We paid Nature's Plus – we paid NPN. We paid NPN money so they can pay their bills.
Q: How much money did you pay NPN?
A: At the beginning we paid $500,000.
Q: What other monies did you pay to NPN for their bills?
A: We paid for their ongoing operational costs.
Q: And how much money did you pay for NPN's ongoing operation costs until August 2009?

  MR. SCHLOSSER [COUNSEL FOR NOI]: Objection. The use of "we" is unclear, vague and ambiguous. Who is making the payment? I object to the form.
  MR. BADWAY (Counsel for NPN): I said you and not "we." And the – I'm sorry, it was the response. I'll ask the witness, your Honor.

Q: When you use the word "we," who do you mean?

. . .

A: Dermagruppen.
Q: What is the Dermagruppen?
A: The holding company.
Q: Do you mean Dermagruppen?
A: Yes.
Q: How much did –

> THE INTERPRETER: Can I make a translator's or Interpreter's note?
> We never gave the answer – I haven't given the answer yet from earlier.
> THE COURT: Go ahead.
> THE INTERPRETER: Do you want that?
> THE COURT: Yes.
> THE INTERPRETER: He said about three million dollars.
> THE COURT: That is for the purchase of the company?
> THE WITNESS: No, those were monies to pay for the ongoing operational costs.
> THE COURT: The operational costs of NPN?
> THE WITNESS: Yes.

Q: Did NPN repay those payments to Dermagruppen?
A: No.
Q: Does NPN still owe that money to Dermagruppen?
A: No.

(Id. at 220-222.)

Nielsen later testified as follows in an exchange with counsel for NOI:

Q: Showing you what is marked as Plaintiff's Exhibit 84, Mr. Nielsen.

. . .

13

Q: Mr. Badway asked you about what happened with all
   that money.  On the first line it says payment of debt; is
   that correct ["Payment of Debt $2,964,481"]?
A: Yes.
Q: And you said the money was paid for NPN's operating
   expenses; is that correct?
A: Yes.
Q: And that money that paid for NPN's operating expenses
   was Dermagruppen's money; is that correct?
A: No. It was transferred as a loan to NPN.
Q: The money didn't come out of NPN's pocket? It
   originated with Dermagruppen; is that correct?
A: That's correct.
Q: And the money didn't come out of NPN's pocket because
   NPN didn't make any money; correct?
A: Yes.  They needed cash.

(Id. at 401-02.)

This testimony is somewhat contradictory.  On the one hand, after reviewing

NPN's exhibit which referred to the "Payment of Debt," Nielsen specifically testified that

the monies for operational expenses was "transferred as a loan to NPN."  On the other hand,

Nielsen previously testified that NPN did not owe anything to Dermagruppen notwithstanding

the lack of any repayments.

Also, of relevance here, one of NPN's other fact witnesses, Abrahamsen, an NPN

executive, engaged in the following exchange with counsel for NOI:

Q: Ms. Abrahamsen, you recognize this schedule [in Exhibit AW]?
A: Yes.
Q: And that is the schedule of the loans that were made to NPN?
A: Yes.

14

Q: And these were the loans that you testified to that
were necessary for NPN to operate its business, correct?

A: Yes.

Q: And NPN received that money from other parties, you are saying, correct?

A: Yes.

Q: And then NPN took that money from these other parties
and paid operating expenses; is that correct?

A: Yes.

Q: And on that page [referring to trial exhibit 84], with that money, the
amount that was owed to Life [a retail company that sold the private
label products NPN bought from NOI] in 2008; is that correct?

A: Yes.

Q: And it used that money that it borrowed to pay for the amounts for advertising and
to Life in 2009; is that correct?

A: Yes.

Q: And it used that money for the inventory that it purchased from Natural Organics
that it had when the contract was terminated, correct?

A: Yes.

Q: So just to reiterate, the severance pay made to
employees was made by NPN from money it had received from
others; is that correct?

A: Yes.

Q: And if you could look at AW and tell me the line
which is October 1, 2008. Do you see comments in the
comments column?

A: Yes.

Q: That line says loan via Dermanor [a member of the Dermagruppen family of
companies]; is that correct?

A: Yes.

Q: October 1, 2008, one million, amount in N-O-K?

A: Yes.

Q: And that was money lent by Dermanor; is that correct?

A: No.

Q: The loan via Dermanor is incorrect on this sheet?

A: I can explain the situation.

Q: Is it correct that the loan was made by Dermanor or not?

A: No.

Q: And where it says loan after that, each time, under
   Dermanor, is there an indication where that money came
   from?
A: I know it comes from NSV Invest [member of the Dermagruppen
   family companies].
Q: Do you know who wrote this down on this chart, loan
   via Dermanor?
A: It was employees in my department.
Q: And they made a mistake?

      MR. BADWAY: Judge, I will object to the
      characterization as a mistake, your Honor. That is not
      what the document says.
      THE COURT: Overruled.

A: Yes.
Q: Was the money from NSV given through Dermanor?
A: Some of it was done via Dermanor.
Q: In other words, NSV gave money to Dermanor, and
   Dermanor gave a loan to NPN?
A: Yes. So we would have better control of the money flow.
Q: The money was actually transferred out of the
   Dermanor account into NSV; is that correct?
A: Yes.
Q: And am I correct that none of this money had ever
   been repaid by NPN to the lender?
A: That is true.

(Id. at 636-40.)

     In the foregoing exchange, it is clear that the documentary evidence refers to "loans"

and even counsel for NOI refers to them as such.

Abrahamsen further testified that "[s]ince NPN was also making money, it is difficult to say which money came from loans and which one came from the operations of companies." (Id. at 640.) Abrahamsen also stated that NPN "didn't have money to pay for long-term debt. But they did make some money from the sales of product and, therefore, they could pay some of the short-term debt." (Id. at 641.)

When asked to identify which "line items NPN paid for itself as opposed to paying for the loans that it received," Abrahamsen conceded that it was "very difficult to confirm" "without having to look at [her] accounting figures." (Id.)

However, NPN, which had the burden of proof at the trial with respect to damages, does not specifically point to any portion of the record that distinguishes between money received by it from Dermagruppen and other entities. This may be because of the interrelationship of the companies and the fact that Dermagruppen was a holding company of NOI.

In any event, the Court finds that given the above-cited testimony and the record as a whole, a reasonable jury could have concluded that NPN borrowed certain monies, with an obligation to repay, from Dermagruppen and other entities in reliance upon the contract.

The Court further finds that the fact that NPN has not repaid most or all of these monies is legally irrelevant under New York law. In this regard, NOI's reliance on Southern

California Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 631 (2003), rev'd in part on other grounds, 422 F.3d 1319 (Fed. Cir. 2005) is misplaced.

As an initial matter, the Court notes that it is interesting that NOI exclusively relies on this Federal Circuit case, not decided under New York law, for the proposition that a debt incurred in reliance upon a contract must have been repaid in order to be recoverable as reliance damages, yet criticizes NPN for relying on a Federal Circuit decision, Westfed Holdings, Inc. v. United States, 407 F.3d 1352 (Fed. Cir. 2005) for the proposition that the source of the underlying funds is legally irrelevant.

In any event, the Court find that, under New York law, which the parties agree governs the terms of the Distributorship Agreement, and consistent with Elvin Assocs. and Mckinley, a debt obligation incurred in reliance upon a contract may be recoverable as reliance damages, even if the obligation has not been paid in full or part.  Indeed, as noted above, in Elvin Assoc., the court awarded damages to a producer for "unpaid debts" related to the failed production.

In this Court's view, this rule makes sense as a logical matter.  Even if a non-breaching party has not repaid a debt taken in reliance upon a contract, it has still incurred a legal obligation to do so.  In this respect, the Court does not find that such a rule bestows a double recovery or windfall on the non-breaching party.

It is true that, at least up until this time, these costs "didn't come out of NPN's pocket" as testified to by Nielsen.  Again, however, as a matter of New York law, this is not fatal to NPN's claim.

In this regard, NOI's reliance on the general principle that, for purposes of calculating contract damages, a non-breaching party cannot be placed in a better economic position than it would otherwise have occupied had the breach not occurred, is only helpful so far as it goes.  This is because, here, a reasonably jury could have concluded that the non-breaching party, NPN, incurred a legal obligation to repay in reliance upon a contract.  As noted above, being awarded the amount of that obligation by the breaching party, NOI, does not place it in a better economic position than it would otherwise have occupied had the breach not occurred.

In any event, at least as to the advertising and inventory costs, a reasonable jury could have concluded they were not debt obligations of NPN, but costs borne exclusively by NPN.  This is because Exhibit No. 84, upon which the jury appears to have based its final calculation of "out of pocket" costs, specifically distinguishes between "Payment of Debt" versus advertising, inventory, and severance pay costs.  The jury's apparent decision to credit this exhibit fell squarely within its prerogative in weighing the evidence.

Alternatively, NOI argues that except for the $430,079 cost of purchasing products from NOI unused as a result of the breach, NPN did not sustain its burden of proving that the

specific line items of reliance damages it sought were within the contemplation of the parties when the contract was consummated.

"[R]eliance damages are recoverable 'provided they are proximate in effect, and are not speculative or uncertain in character and were fairly within the contemplation of the parties when the [contract] was made, or might have been foreseen as a consequence of a breach of its covenants.'" <u>St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.</u>, 121 A.D.3d 1226, 1227, 994 N.Y.S.2d 704, 706 (3d Dep't 2014)(quoting Friedland v. Myers, 139 N.Y. 432, 436, 34 N.E. 1055 (1893)).

Here, the Court finds that, except for the severance pay that NPN made to five of its employees it laid off after the breach of the contract, a reasonable jury could have concluded that the other forms of reliance damages awarded by the jury were fairly within the contemplation of the contracting parties, NPN (then known as Benevo) and NOI.

Indeed, the Distribution Agreement explicitly provided for certain "minimum" advertising and promotion expenditures by NPN. (Agreement, Decl of Ernest D. Badway, Exh 7, at 1.). Even if, as here, NPN exceeded the minimum advertising and promotion expenditures by NPN, it does not follow that the excess expenditures were not reasonably foreseeable. These were specifically designated as "minimum" amounts.

NOI's argument that no individual connected with Dermagruppen, as opposed to NOI, was involved in or had any knowledge of any communications regarding the Distributorship Agreement at or prior to its signing is legally irrelevant. Dermagruppen is no longer a party to this action. That the proceeds of the underlying judgment may inure to Dermagruppen, the holding company for NPN, is legally immaterial in this analysis.

Further, the Court finds that a reasonable jury could have concluded that it was within the contemplation of the contacting parties that NPN would have borrowed some monies from other entities, related or not, to pay for its operating costs.

However, as noted above, the Court finds that a reasonable jury could not have concluded that NPN's employee severance payments in the amount of $133,192 (Exh. 84.) made following the breach of the contract were contemplated by the contracting parties. Contrary to NPN's contention, that NOI knew that NPN had employees and even inquired about staffing was not sufficient to put NOI on notice that it could be liable for severance payments to certain NPN employees that NPN was required to make under Norwegian and Swedish law.

Further and alternatively, the Court finds that a reasonable jury could not have concluded that the severance payments qualified as a form of "out of pocket expenses" incurred by NPN "during the term of the contract." (Verdict Sheet, Doc No. 340-2, at 1.) This

is because NPN concedes that it fired five employees after the breach and, as to the severance payments in connection, "that these costs were ultimately paid out after" the breach. (Doc No. 355, at 13-14.)

NPN contends that it "internalized these costs from the moment these employees were hired" and "incurred the costs for severance prior to the breach." (Id.)  However, NPN does not cite any Norwegian or Swedish law to confirm this assertion.  While it may be true that these severance payments were mandatory under Norwegian and Swedish if the subject employees were fired, it does not follow, at least without some citation to the laws of those countries, that NPN was owed these costs or became liable for them prior to the firings.

In any event, as noted above, even if the severance pay costs were incurred by NPN prior to the breach, a reasonable jury could not have concluded that they were fairly within the contemplation of the contracting parties.

Based on the foregoing reasons, NOI's Rule 50 motion is granted in part and denied in part.  The motion is granted as to the award of employee severance pay in the amount of $133,192 awarded as "out of pocket" expenses.  That motion is otherwise denied.

B.  <u>The Rule 59 Motion</u>

The Court next considers NOI's Rule 59 motion, made in the alternative to its Rule 50 motion.

Rule 59(a) states that a court may grant a new trial in a jury case for any of the reasons "for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A new trial is necessary if "the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that . . . that the jury . . . reached a seriously erroneous result or . . . the verdict [was] a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 399 (2d Cir. 2005); Barrella, 43 F. Supp. 3d at 184.

Further, "[a] new trial may be granted [ ] when the jury's verdict is against the weight of the evidence." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998). In contrast to a motion for judgment as a matter of law, a court may grant a motion for a new trial "even if there is substantial evidence supporting the jury's verdict." Id. at 134. In addition, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." Id. (citing Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)).

However, a court considering a Rule 59 motion for a new trial "must bear in mind [ ] that the court should only grant such a motion when the jury's verdict is 'egregious.'" Id. (citation omitted).

"The decision whether to grant a new trial under Rule 59 "is 'committed to the sound discretion of the trial judge.'" <u>Conte v. Cnty. of Nassau</u>, No. 06-CV-4746 (JFB)(GRB), 2015 WL 1529787, at *4 (E.D.N.Y. Apr. 2, 2015)(citations omitted).

Here, NOI does not point to any evidentiary errors. Rather, NOI contends that the damages award here was against the weight of the evidence. The Court disagrees. As noted above, some of the relevant testimony was contradictory. However, in the Court's view, the jury award of reliance damages, save for the severance pay, was not against the weight of the evidence, particularly in light of Exhibit 84, which specifically distinguished between NPN's debt expenses and other expenses.

Accordingly, the Court exercises its discretion and denies NOI's alternative Rule 59 motion for a new trial.

C. <u>NPN's Motion for Pre-Judgment Interest, Post-Judgment Interest and Costs</u>

As previously noted, NPN has moved for (1) pre-judgment interest in the amount of $2,180,801.01 under CPLR 5001, *et seq.*; (2) post-judgment interest pursuant to 28 U.S.C. § 1961(a) at the statutory rate calculated from the date of the entry of judgment; and (3) costs in the amount of $150,272.83 pursuant to 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1), and Local Civil Rule 54.1.

As an initial matter, the Court notes that it reviewed NOI's letter dated March 10, 2015 asking that the Court treat the amended motion for pre- and post-judgment interest and costs, which reduced the amounts previously sought, as the operative motion. NOI appears to make this request out of an abundance of caution because in its view, on February 21, 2015, the Court denied as duplicative NPN's amended motion dated February 13, 2015.

However, although it concededly did not expressly reserve decision on the balance of the February 13, 2015 motion, closely read, the Court only denied that part of the motion seeking entry of judgment. Therefore, NOI's request that it treat February 13, 2015 motion as the operative motion is not necessary. However, the Court appreciates NOI's specifically alerting it to the monetary discrepancies between the underlying motions, something NPN, the moving party, failed to do.

As to the February 13, 2015 motion, NOI first argues that Local Civil Rule 54.1(a) bars NPN's request for costs pending post-trial motions.

Local Rule 54.1(a) provides that "costs will not be taxed during the pendency of any appeal, motion for reconsideration, or motion for a new trial." Here, however, the post-trial motions for judgment as a matter of law and a new trial have now been resolved.

Notably, in citing this rule, NOI omits the directive that costs not be taxed

during the pendency of an appeal, perhaps because, as stated later, NOI has expressed

an intention to move for costs associated with claims of the former Defendant

Dermagruppen that were dismissed.

On March 6, 2015, NOI filed a notice of appeal of the judgment based on the

jury verdict to the Second Circuit.  However, as previously noted by this Court, an

appeal is not "effective" under Federal Rule of Appellate Procedure 4(a)(3)(B) until

disposition of all postjudgment motions. (Doc No. 361, at 2.); <u>see</u> <u>Hodge ex rel. Skiff v.</u>

<u>Hodge</u>, 269 F.3d 155, 157 (2d Cir. 2001)(per curiam)("Where, as here, the notice of

appeal is filed prior to the disposition of a postjudgment motion, the notice of appeal

'becomes effective' only upon the district court's disposition of all timely

postjudgment motions."); <u>id.</u> at 157 n. 4 ("We pause to remind the clerks of the district

courts that the filing of a notice of appeal does not divest the district court of

jurisdiction to decide any of the postjudgment motions listed in Fed. R. App. P. 4(a)(4)

(A), if timely filed. On the contrary, the notice of appeal must be held in abeyance by

this Court until all such motions are disposed of, at which point the notice of appeal

becomes effective."); <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 533 (2d Cir. 1994)(a "notice of

appeal [becomes] a nullity" upon the timely filing of a Rule 4(a)(4)(A) motion).

The Court is not ready to issue a ruling on whether, at this point, it may tax

costs under Fed. R. Civ. P. 54 and Local Civil Rule 54.1(a) notwithstanding the filing

of NOI's notice of appeal.

"In any event, '[t]he local rule, however, transparently pertains to 'costs,' and postjudgment interest is not a 'cost.'" <u>Barrella</u>, 43 F. Supp. 3d at 196 (citations omitted). "Nor, the Court finds, is pre-judgment interest on costs a 'cost' within the meaning of Local Rule 54.1." <u>Id.</u>

Nevertheless, given that the Court's ruling on the severance pay portion of reliance damages will invariably change the calculations of pre- and post-judgment interest, the Court denies without prejudice the operative aspects of NPN's February 13, 2015 amended motion for pre-judgment interest, post-judgment interest, and costs, with leave to renew. The parties are directed to address the Court's power to tax costs at this juncture. NPN is directed to file this second amended motion within fourteen days of the date of this order.

Separately, NOI has expressed its intention to move for the taxation of costs as to certain claims of the former defendant Dermagruppen. NOI prevailed on summary judgment on the Dermagruppen breach of contract claim and Franchise Act claim. Thereafter, Dermagruppen voluntarily withdrew its Lanham Act claim, without costs. NOI contends that, as the prevailing party on Dermagruppen's breach of contract and Franchise Act claims, it is entitled to an award of costs related to those claims.

NPN counters that these costs are not recoverable as the breach of contract and Franchise Act claims by Dermagruppen were inextricably intertwined with the breach of contract claim against NOI on which NPN prevailed at the trial.

The Court declines to address these arguments absent a formal motion and as noted above, without hearing from the parties about whether it may tax costs, at least as against NOI, under Fed. R. Civ. P. 54 and Local Civil Rule 54.1(a) notwithstanding the filing of NOI's notice of appeal.

Therefore, the Court directs NOI to make any motion for Rule 54 costs within fourteen days of the date of this order.

## II. CONCLUSION

Based on the foregoing reasons, NOI's Rule 50 motion for judgment as a matter of law is granted in part and denied in part. The motion is granted so as to vacate that portion of the "out of pocket" expenses jury award based on employee severance pay in the amount of $133,192. The motion is otherwise denied. NOI's alternative Rule 59 motion is also denied. An amended judgment will be entered following disposition of NPN's requests for pre- and post-judgment interest.

NPN's February 13, 2015 amended motion for pre-judgment interest, post-judgment interest, and costs is denied without prejudice with leave to renew to account for the Court's

ruling on severance pay. Any such motion must be filed within fourteen days of the date of this order, after which NOI will have fourteen days to respond, with a reply brief, if any, by NPN then filed within 7 days. The parties are directed to address the issue as to whether the Court may tax costs under Fed. R. Civ. P. 54 and Local Civil Rule 54.1(a) at this juncture of the litigation notwithstanding the filing of NOI's notice of appeal.

Finally, the Court directs NOI to file any contemplated Rule 54 motion as to Dermagruppen within fourteen days of the date of this order, after which Dermagruppen will have fourteen days to respond, with a reply brief, if any, by NOI then filed within 7 days. Although Dermagruppen was previously represented in this case by counsel for NPN, the Clerk of the Court is respectfully directed to reinstate Dermagruppen on the electronic docket so it will receive formal notice of any such motion.

That part of NPN's March 26, 2015 motion for pre-judgment interest in the amount of $2,180,801.01 is denied as duplicative of the same request as in the February 13, 2015 motion.

**SO ORDERED**.

Dated: Central Islip, New York
April 14, 2015


__*Arthur D. Spatt*_____

ARTHUR D. SPATT
United States District Judge